993 A.2d 400 (2010)
2010 VT 5
In re M.L. & Z.L., Juveniles.
No. 09-089.
Supreme Court of Vermont.
January 29, 2010.
*401 William H. Sorrell, Attorney General, Montpelier, and Martha Csala and Jody Racht, Assistant Attorneys General, Waterbury, Bridget C. Asay, Assistant Attorney General, Montpelier, and Steven Dunham, Office of the Public Defender, St. Albans, for Appellants.
Kurt M. Hughes of Murdoch Hughes & Twarog, P.C., Burlington, for Appellees.
Present: REIBER, C.J., DOOLEY, JOHNSON, SKOGLUND and BURGESS, JJ.
*402 BURGESS, J.
¶ 1. The State of Vermont appeals from the family court's dismissal of its petition to declare juveniles M.L. and Z.L. as children in need of care or supervision (CHINS). Children join the State's appeal. The State asserts that the family court applied an improperly high standard of proof and relied on irrelevant evidence in reaching its conclusion. We affirm.
¶ 2. Parents have two children, a daughter M.L., born in June 2002, and a son Z.L., born in November 2007. In March 2008, three-month-old Z.L. was rushed to the hospital with life-threatening head injuries. In treating Z.L., doctors observed what they believed were signs of prior and current physical abuse. A CT scan revealed that Z.L. had a nondepressed left temporoparietal fracture extending to the right parietalin other words, a skull fracture that originated on the left side and essentially went from ear to ear over the crown of his head. He also had a linear fracture in the back part of the right side of the skull. Additionally, Z.L. had a new acute subdural hematoma on the left side, and a chronic subdural hematoma on the right side of his brain that appeared to be between two-to-four weeks old.[1] Parents told doctors that Z.L. was injured when M.L. dropped Z.L. and fell on top of him. Z.L.'s treating physicians found this explanation completely inconsistent with the nature of Z.L.'s extensive injuries. Following a police investigation, the State filed petitions to have the children declared CHINS, and the children were ordered into the emergency custody of the Department for Children and Families (DCF).
¶ 3. Prior to the merits hearing, mother moved to return M.L. to her custody. She asserted that there was no pattern of abuse or neglect that would allow the court to impute risk of harm to M.L. from the severe injuries suffered by Z.L. Following a two-day hearing, the family court, Judge Howard Van Benthuysen presiding, denied mother's motion. The court found that the evidence clearly and convincingly established that Z.L.'s acute head injuries were caused when he was struck in the head by enormous force, such as the force generated when an infant is swung by his feet and its head is struck against an object. Even if M.L. had dropped Z.L., the court reasoned, that act did not cause any of his injuries.
¶ 4. The court recounted that Z.L. had suffered not one but two life-threatening skull fractures and grossly traumatic brain injuries within a two-to-four-week period. The latter incident nearly caused his death, and it required two extensive brain surgeries. The injuries caused the clinical death of nearly half of his brain. This latter incident alone, the court concluded, was sufficient for the court to be concerned about M.L.'s safety. It was so horrific, so traumatic, and required so much force, and it could only have been inflicted by an adult. It was therefore reasonable to conclude that M.L. could be in danger if returned to parents' custody. See E.J.R. v. Young, 162 Vt. 219, 224, 646 A.2d 1284, 1287 (1994) ("The family court may rely on evidence of the treatment of a sibling in concluding that a child is a CHINS.").
¶ 5. The family court, Judge Mark Keller presiding, subsequently held a nine-day hearing on the merits of the State's CHINS petition. The parties also agreed that the court could consider the evidence presented at the hearing before Judge Van *403 Benthuysen. In February 2009, the court issued a written decision dismissing the CHINS petition. It found the State's medical evidence compelling, but reasoned that this evidence must be viewed in the totality of the circumstances. The court found that the nonmedical evidence established that parents were good parents, and that there was no nonmedical evidence to support the allegation that parents abused Z.L. It thus concluded that the State failed to prove by a preponderance of the evidence that Z.L. was abused or that M.L. was in need of care or supervision.
¶ 6. Before recounting the court's specific findings, we briefly review general principles applicable to this case. The family court's primary concern in proceedings such as this one "must be with the welfare of the child." In re R.B., 152 Vt. 415, 420, 566 A.2d 1310, 1313 (1989). As relevant here, a child is CHINS when he or she has been abused by his or her parents or is without proper parental care or subsistence, or other care necessary for his or her well-being. 33 V.S.A. § 5502(a)(12)(A)-(B).[2] The State must prove that a child is CHINS by a preponderance of the evidence. In re A.D., 143 Vt. 432, 435, 467 A.2d 121, 123 (1983).
¶ 7. We expressly adopted the preponderance standard for CHINS cases rather than the more stringent "clear and convincing" standard applicable in termination of parental rights cases. Id. In doing so, we recognized that both parents and the State have substantial, legitimate, and compelling interests at stake in CHINS proceedingsthe State in ensuring the "safety and welfare of the child" and the parents in "maintaining family integrity." Id. at 435-36, 467 A.2d at 124. We concluded that the preponderance standard properly balanced these interests, particularly given that parents' rights are at most temporarily curtailed in a CHINS proceeding. See id. at 436, 467 A.2d at 124 ("[T]he State's interest in protecting a child from the risk of serious and potentially irrevocable harm counterbalances the parents' interest in avoiding an erroneous curtailment of their rights.") (quotations omitted).
¶ 8. On review of the court's CHINS decision, we will uphold the court's findings of fact unless they are clearly erroneous; we will uphold the court's legal conclusions where supported by its findings. In re A.F., 160 Vt. 175, 178, 624 A.2d 867, 869 (1993). "We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." Id.
¶ 9. With these standards in mind, we turn to the court's decision. As reflected above, the State alleged that Z.L. was CHINS because he was abused by parents and that M.L. was CHINS because she was without proper parental care or other care necessary for her well-being. Parents asserted that M.L. accidentally caused Z.L.'s injuries, and they theorized that Z.L.'s older hematoma may have been caused by various medical conditions.
¶ 10. Parents testified to the following version of events. On the day Z.L. was hospitalized, mother was home with the children. Father returned home from work about 4 p.m. Following an early dinner, parents went upstairs and left M.L. and Z.L. alone in the living room. M.L. was sitting on a child-sized papasan chair, and Z.L. was adjacent to her in a "boppy," or horseshoe-shaped pillow, on *404 the floor. When parents returned downstairs approximately five minutes later, mother saw Z.L. lying face up on the living room floor and M.L. getting up off the floor. Mother testified that M.L. told her that she fell with Z.L. At mother's request, father fetched their neighbor, who was a nurse-in-training. Mother called 9-1-1, and the neighbor advised the dispatcher, relying on mother's representations, that M.L. had been holding Z.L. and that Z.L. fell and hit his head on the floor.
¶ 11. Mother stated that she took M.L. upstairs when the ambulance was on its way. She asked M.L. why she picked up Z.L., and M.L. replied "because he was so cute" and stated that she "couldn't help herself." Mother indicated that she went back upstairs again to check on M.L. before the ambulance arrived but she did not have any further conversation with M.L. Neighbor testified that after mother and Z.L. left in the ambulance, father asked M.L. to show him what happened. M.L., who was visibly upset, indicated that she picked up Z.L. and held him against her upper body. She stated that she tried not to fall on him. The court found that neither parent had the opportunity to influence M.L.'s statement, and that her statement was an excited utterance, which had a high degree of reliability. The court also found neighbor's testimony highly credible.
¶ 12. Both sides presented expert medical testimony to support their positions as to the intentional or accidental nature of Z.L.'s injuries. The court prefaced its evaluation of this evidence by making three general observations. First, it found that the medical experts based their opinions on anecdotal information that resulted in a probability that a certain version of events occurred. Second, the evidence primarily addressed the treatment of traumatic injuries like those suffered by Z.L., rather than the cause of such injuries. Finally, the court indicated its belief that there was a medical presumption of abuse. It found that the parties' evidence frequently cited the philosophy that in cases such as this one, where a child suffered an injury that appeared to be inconsistent with the explanation offered by parents, nonaccidental causation would be "presumed" until proven otherwise. The court observed that this was an appropriate approach for the medical community, but not a legitimate way to make legal decisions. The court stated that it would "not accept the assertion that a suspicious injury is abuse until proven otherwise," because that would force parents to prove an absence of liability.
¶ 13. The court explained that the medical experts presented two possible scenarios. According to the State's experts, Z.L. suffered from a series of nonaccidental injuries. One occurred at least two-to-four weeks before the March 5 incident, and it resulted in the chronic subdural hematoma. Another was the March 5 incident when Z.L. suffered the acute subdural hematoma. The State theorized that the child's skull fractures may have been caused at roughly the same time as the acute subdural hematoma or could have occurred up to two weeks earlier. The State explained that the bilateral skull fracture had different orientation and thus a different causation than the right temporal skull fracture. In short, the State maintained that Z.L. had to have suffered from at least three or more acts of nonaccidental injury, specifically, abuse. The State presented extensive medical testimony from Z.L.'s treating physicians and others in support of its case.
¶ 14. The State also cited numerous studies demonstrating that the odds and probabilities supported its position. One study showed, for example, that a child had a one-in-a-million chance of suffering *405 life-threatening injuries from a short fall. The State also introduced studies showing that parents often lie in child abuse cases and that they often blame siblings for the child's injuries. The court found two problems with these studies. First, there were exceptions to each of the assertions and, in some cases, the exceptions were substantial. Second, there was a lack of certainty as to which cases constituted abuse. The court questioned whether its CHINS decision would similarly be factored into a study and used as an example of parents lying about child abuse.
¶ 15. Parents maintained that Z.L.'s acute subdural hematoma and skull fractures were caused by his sister crushing his skull when she fell on top of him. M.L. weighed eighty pounds at the time, and Z.L. weighed twenty pounds. The court indicated that if one believed M.L.'s statement after the alleged event, M.L. could have fallen directly on Z.L.'s head, driving it into the floor. The floor was wood covered by a thin pad and carpet. Parents' medical experts testified that this would explain Z.L.'s acute injuries.
¶ 16. Parents' experts also theorized about the chronic subdural hematoma. They suggested that Z.L. may have suffered a subdural hematoma as a result of birth and that the excess fluid from the hematoma caused the excess space between the dura and the brain, which stretched the veins. Another theory was that Z.L. had external hydrocephalus, which occurs when there is an excess space between the brain and the membranes surrounding the brain. This space could have been filled with spinal fluid, which can cause the veins that extend from the brain through the arachnoid and dura to the skull to be stretched. Theoretically, the stretched veins would be more susceptible to breaking from minor trauma or no trauma at all. Parents argued that it was likely that Z.L. had this condition because it has been connected to one of two other conditions, macrocephaly (a very large head in proportion to the body) and positional plagiocephaly (a flat portion of the skull believed to occur when a child is left in one position for long periods).
¶ 17. The court found that Z.L.'s head appeared to be large for his age and body and that it may have grown at a fast rate; thus, it was entirely possible that Z.L. was macrocephalic at the time of the accident, making him a strong candidate for external hydrocephalus. The court also found that Z.L. had positional plagiocephaly. While the State's experts agreed that Z.L. had a large head and a flatness to a portion of his skull, they asserted that the child's brain, as depicted in the scans, was normal (except for the presence of the subdural hematomas), and not indicative of a brain with external hydrocephalus.
¶ 18. The court found that whatever the cause of the subdural hematoma, parents' experts and many of the journal articles supported an assertion that the subdural hematoma could rebleed and enlarge with only minor trauma. The court found this important because it could explain the presence of a chronic subdural hematoma long after it normally would have resolved. It also observed that the presence of the chronic subdural hematoma and the potential for a rebleed could have contributed to the dramatic damage to the brain caused by the acute subdural hematoma. In other words, the force of impact could have caused more damage to Z.L. because of the presence of the chronic subdural hematoma than it may have caused another infant who did not have this underlying condition.
¶ 19. After setting forth the parties' positions, the court found that the State presented compelling evidence to support its position that Z.L. suffered head injuries *406 on at least two occasions and that the injuries were nonaccidental. The State's experts noted that radiographic images revealed fluid of three different agesacute, sub-acute, and chronic. The images also revealed two fractures, the right temporal bone fracture and the biparietal fracture radiating from the left side of the head. The fractures were separated by approximately two or more inches of normal skull and were oriented differently. The State's experts opined that the fractures were caused by separate mechanisms involving great force. They noted that Z.L. had at least two subdural hematomas separated by weeks in occurrence. Finally, the State's experts explained that a great deal of force was necessary to break the child's skull, and that the fracture itself was inconsistent with a compression-type fracture which, it was asserted, would be expected from M.L. crushing Z.L.'s head between her body and the floor as a result of a fall. The experts also testified that the force created in the fall was insufficient to cause the injuries.
¶ 20. The court found, however, that the experts failed to answer two additional fundamental questions: (1) what was the force necessary to injure an infant's skull and brain; and (2) what would be the force generated by an eighty-pound child falling on a twenty-pound infant. The court inquired on this topic at the hearing, asking the parties if they would be calling an expert to testify to such matters. Mother's attorney indicated that they would not be calling such a witness as the State was not. Father's attorney asserted that the possibilities and the mechanics underlying such a calculation were infinite. We note that the State did offer expert testimony that Z.L.'s injuries were similar to children who had been involved in high-speed car accidents, and that parents' theory that M.L. caused these injuries defied the laws of physics, given that force equals mass multiplied by acceleration.
¶ 21. The State's experts also opined, and the court later agreed, that parents' arguments were based on possibilities, not probabilities. Parents' experts first raised the possibility that Z.L. could have suffered from a subdural hematoma during birth. The State submitted research and expert testimony that only a small percentage of children suffer from these subdural hematomas, that the births are typically traumatic in some form, and that the hematomas resolve and disappear well before the child is three months old. The court found, however, that some of the articles offered "cause for pause." For example, according to an article in Neurological Surgery (5th edition), it might not be surprising that parents could not point to a specific incident to explain a chronic subdural hematoma. The court also found that, due to the lack of specific information on the very complex questions about the force necessary to cause certain injuries and the effect of those forces on an infant's brain, there was a clear danger of oversimplification.
¶ 22. Nevertheless, the court continued, "if this was simply a battle of the experts," it would agree with the State that Z.L.'s injuries were probably the result of nonaccidental means. That is, a fall involving M.L. was probably not the cause of the extensive, acute damage to the skull and brain. Nor, said the court, was the chronic subdural hematoma probably caused by the series of medical conditions described by parents' experts. The court indicated that it used the word "probably" intentionally, insofar as the State's case was indeed much more probable, while the defense case was more of a possibility. Yet, the court concluded, this case was not simply a battle of the experts.
*407 ¶ 23. The court reasoned that the expert testimony must be viewed in the totality of the circumstances, indicating that all of the nonmedical evidence proved that parents were very good parents. As support for this assertion, it noted that parents had a sweet, caring, normal daughter who exhibited no signs of distress, and that community members spoke highly of M.L. and her parents. Despite the fact that the children's pediatrician testified unequivocally that Z.L.'s injuries were caused by intentional acts of physical abuse, the court found only that in the doctor's prior dealings with parents, he observed them to be normal, concerned individuals. The court also found that parents' neighbor, who had daily contact with the family, stated that she noticed no signs of distress in Z.L. Additionally, it found that M.L.'s kindergarten teacher indicated that M.L. would have likely disclosed if she was the subject of abuse or an unhappy home, and she had not done so. The court had earlier found, as well, that M.L., without coaching or parental influence, credibly assumed responsibility for falling on the babythe incident that apparently precipitated mother's call to the neighbor for assistance and the ensuing 9-1-1 call. Finding no nonmedical evidence to support the allegation that either or both parents abused Z.L., the court concluded that the State failed to prove by a preponderance of the evidence that Z.L. was in need of care or supervision. The court later indicated that its decision applied to M.L. as well. This appeal by the State and children followed.
¶ 24. The State argues that the court held it to an improperly high standard of proof. It maintains that when the court found its case "much more probable" than that asserted by parents, it acknowledged that the State met its burden of proof. According to the State, the court erred by then requiring the State to corroborate its medical evidence with nonmedical evidence. The State also challenges the court's suggestion that its case was based on a "medical presumption of abuse," and posits that its medical experts testified that Z.L.'s head injuries were so extensive and extreme that the only possible explanation for them was abusive head trauma. The State asserts that the court also misapprehended the extensive evidence it presented as to the enormous amount of force necessary to cause the injuries at issue here. Finally, the State argues that the court erred in relying on two articles that had no relevance to Z.L.'s medical condition.
¶ 25. We agree that the court framed its decision in a confusing manner, but we conclude that the decision must stand. As previously noted, the State was required to prove that Z.L. was abused and that M.L. was without proper parental care by a preponderance of the evidence. This standard is satisfied "[w]hen the equilibrium of proof is destroyed, and the beam inclines toward him who has the burden, however slightly .... A bare preponderance is sufficient, though the scales drop but a feather's weight." Livanovitch v. Livanovitch, 99 Vt. 327, 328, 131 A. 799, 800 (1926) (quotation omitted).
¶ 26. The court did appear to find, as the State argues, that the medical evidence demonstrated that it was much more probable that Z.L.'s injures were intentionally inflicted than accidentally incurred. The court did not, however, fault the State for failing to corroborate this evidence with nonmedical evidence. The court apparently concluded that the nonmedical evidence in this case was entitled to at least as much weight as the medical evidence, and that the State, as the moving party, therefore failed to meet its burden of persuasion. See, e.g., 2 K. Brown, et *408 al., McCormick on Evidence § 336, at 471 (6th ed. 2006) (term "burden of proof" encompasses two separate burdens: (1) the burden of "producing evidence, satisfactory to the judge, of a particular fact in issue"; and (2) "the burden of persuading the trier of fact that the alleged fact is true"). As one court has explained, "[t]he term `preponderance' means that upon all the evidence the facts asserted by the plaintiff are more probably true than false." Nissho-Iwai Co. v. M/T Stolt Lion, 719 F.2d 34, 38 (2d Cir.1983) (quotation omitted). If the court "finds that the testimony of both parties is in balance, or equally probable, then the moving party will have failed to sustain the required burden." In re Kelton Motors, Inc., 130 B.R. 170, 174 (Bankr.D.Vt.1991); see also Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 137 n. 9, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997) ("[T]he preponderance standard allows both parties to share the risk of error in roughly equal fashion, except that when the evidence is evenly balanced, the party with the burden of persuasion must lose." (quotations and citations omitted)).
¶ 27. As the court recounted, parents had a stable marriage, and father earned a sufficient salary to allow mother to stay at home with the children. Parents had no criminal records aside from father's 1996 DWI conviction. There was no history of abuse in the family, nor any indication from parents' neighbor, M.L.'s teacher, or acquaintances, that abuse might have occurred, and the family had no prior involvement with DCF. Indeed, the court found that all of the witnesses who regularly saw or cared for the children agreed that there was no evidence that either child was abused in any manner. This evidence was relevant, and the court plainly found it as persuasive as the evidence presented by the State on the issue of whether the children were CHINS. Without expressly saying so, it is evident that the family court considered the evidence to be in equipoise.
¶ 28. We note, moreover, that while the court found the State's evidence compelling, it also expressed its reservations about the general nature of the medical evidence throughout its decision. The court acknowledged the State's expert testimony that the force generated by the alleged fall was insufficient to explain Z.L.'s injuries. At the same time, parents' experts testified that the fall was sufficient to cause Z.L.'s injuries. Given this, it is understandable why the court sought, and noted the absence of, additional information about the specific amount of force necessary to injure an infant's skull and brain and the specific force that might be generated by the alleged fall here. Additionally, the court's expressed reservation about a "medical presumption of abuse," while perhaps poorly worded, essentially reiterated the State's burden of proof (without the benefit of any such medical presumption) in cases like this one.
¶ 29. While we might have reached a different decision than the family court, we are not persuaded that the court held the State to a heightened standard of proof. The court heard evidence over the course of nine days, and, as the family court acknowledged, it reached its decision after much review and deliberation. We are mindful that it is the exclusive role of the family court to weigh the evidence and assess the credibility of witnesses. A.F., 160 Vt. at 178, 624 A.2d at 869. This case turned on the court's assessment of the weight of the evidence. While the State may have satisfied its prima facie burden, the family court was ultimately not persuaded by its evidence. In other words, although there was evidence tending to support the State's position, the court *409 reasoned that such evidence, in its judgment, did not preponderate, and so, in a legal sense, it was unable to find that the children were CHINS. See McClary v. Hubbard, 97 Vt. 222, 238, 122 A. 469, 476 (1923) (applying similar rationale). We will not disturb the court's assessment of the evidence on appeal.
¶ 30. The State's suggestion that the court erred in citing several journal articles is equally unavailing. The State correctly notes that in one of the articles cited by the court the author explicitly stated that precipitating factors for chronic subdural hematomas are "chronic alcoholism, epilepsy, coagulopathy, and the use of anticoagulants," none of which were at issue here. Additionally, in an article about the significance of a subdural hematoma in a child with external hydrocephalus, the author opined that "in the absence of other evidence of inflicted injury," the "presence of a subdural hematoma in a child with external hydrocephalus was, by itself, insufficient to prove abuse." The State asserts that there was other evidence of inflicted injury here and there was no evidence that the child actually had external hydrocephalus.
¶ 31. We presume that the court was aware of these caveats, although it chose not to include them within its opinion. The thrust of the court's statements about these articles is that there are exceptions or possible explanations for certain injuries similar to those suffered by Z.L. The court emphasized this point in its observations about the medical evidence in general. In any event, the court found the State's medical case more probable than parents' theories, despite its observations about these articles, and the State fails to show that it committed reversible error by citing these articles.
Affirmed.
REIBER, C.J., dissenting.
¶ 32. The majority's decision fails to reconcile the family court's ultimate conclusion that parents did not abuse Z.L. with the court's finding that the State presented much more probable evidence than parents as to how Z.L.'s injury arose. Because the court found that Z.L. suffered a severe nonaccidental injury while in parents' exclusive care, the only possible conclusion that the trial court could have reached is that it is more probable than not that parents were responsible for inflicting serious abuse on Z.L. The State met its burden of demonstrating by a preponderance of the evidence that Z.L. is a child in need of care or supervision (CHINS). The evidence of parents' apparent good character did not rise to a level sufficient to rebut the court's findings on the credibility of the medical evidence, which the trial court found conclusively established that Z.L. was injured by nonaccidental means. Because I believe that the standard of proof was met in this case, I dissent.
¶ 33. Our primary concern in a CHINS proceeding is to protect a child from future harm. See E.J.R. v. Young, 162 Vt. 219, 222-23, 646 A.2d 1284, 1286 (1994) (explaining that CHINS adjudications are both remedial and preventative). Given the State's strong interest in "protecting a child from the risk of serious and potentially irrevocable harm," In re A.D., 143 Vt. 432, 436, 467 A.2d 121, 124 (1983) (quotation omitted), the State has the burden of proving its case "by a preponderance of the evidence." In re D.T., 170 Vt. 148, 156, 743 A.2d 1077, 1084 (1999). "The State may do so by establishing any combination of statutory factors, including abandonment, abuse, or lack of parental care or subsistence necessary for the child's well-being." In re J.R., 164 Vt. 267, 270, 668 A.2d 670, 673 (1995); see 33 *410 V.S.A. § 5502(a)(12)(A)-(B)[3] (delineating that a child is a CHINS if he has been abused or neglected by a parent). In this case, the sole impetus for the CHINS filings was Z.L.'s severe skull and brain injuries. The State filed petitions on behalf of both children, alleging that Z.L. was a CHINS because he was abused by his parents, and that M.L. was without proper parental care. 33 V.S.A. § 5502(a)(12)(A)-(B).
¶ 34. That Z.L. suffered severe and extensive injuries was not disputed. Z.L. had two skull fractures, one running from ear to car and the other extending from behind his right ear to the base of his skull. He also had a large acute subdural hematoma on the left side of his brain, and a chronic subdural hematoma on the right side of his brain. The main issue at trial was the cause of Z.L.'s injuries, and, as the trial court recognized, the State and parents presented "two possible scenarios." Either Z.L. was abused by his parents, or he was injured during an accidental fall involving his sister M.L. According to the State, Z.L. was injured during a series of nonaccidental injuries. The State presented the testimony of six experts, five of whom were treating physiciansfour doctors who treated Z.L. in the hospital, the children's regular pediatrician, and a pediatrician with extensive experience in child abuse. All of these experts agreed and unequivocally stated that Z.L.'s injuries were caused by severe head trauma. Because Z.L. had two skull fractures in different orientations, and both old and fresh subdural hematomas, the State's experts explained that Z.L. had suffered injury on more than one occasion. The State's experts all agreed that Z.L.'s injuries could not have resulted from an accident with his older sister, and the trial court did not reject this evidence.[4] The experts testified that Z.L.'s injuries were simply too severe, and the injury did not fit a compression-type accident, as would have resulted from a fall with M.L. In addition, they concluded that Z.L. suffered injuries at distinctly different points in time and that the parents' evidence did not adequately explain Z.L.'s multiple injuries over time. The State's experts agreed that the injuries were the result of abuse.
¶ 35. Parents' explanation was that some of Z.L.'s injuries were caused by his sister falling while holding him and crushing *411 his head between her and the floor, and that Z.L.'s chronic subdural hematoma was the result of preexisting medical conditions that made Z.L. more prone to brain injury. Parents' experts allowed that parents' explanation was a possibility, although they could not confirm it, and the experts therefore did not conclude that Z.L. actually had a preexisting medical condition that would have resulted in a chronic subdural hematoma.
¶ 36. The court recounted the expert testimony on both sides and concluded: "if this was simply a battle of the experts the court would agree with the state that the injuries to Z.L. were probably the result of non-accidental means." Ultimately, the court found the State's medical evidence more probable than that submitted by parents. Nonetheless, the court concluded that other nonmedical evidence, which was more circumstantial and less direct than the State's witnesses, persuaded it that Z.L. was not abused by his parents. The evidence the court relied on included: parents' stable relationship; a lack of history of abuse in the family or involvement with DCF; a lack of evidence of other instances of abuse of either M.L. or Z.L.; and reports from teachers and caregivers that M.L. is well-adjusted and has no behavioral problems. The court thus denied the CHINS petition.
¶ 37. The court's conclusions, however, are not consistent with its findings, and at a minimum the case should be remanded for the trial court to attempt to reconcile the discordancies between its findings and conclusions. Without further explanation and on the record we have, the decision cannot be affirmed.
¶ 38. In a strikingly similar case, a Louisiana court of appeals reversed a trial court's conclusion that an infant was not abused where the trial court based its decision on nonmedical evidence of the parents' loving nature. State ex rel. W.H.V. v. J.A.V., 811 So.2d 189 (La.Ct. App.2002). In that case, a three-week-old infant was brought to the hospital after the mother noticed the baby's body was twitching on one side. Scans and x-rays revealed an intracranial hemorrhage, fractured ribs, a fractured ankle, and a fracture in the thumb. The Department of Social Services sought to adjudicate the child as one in need of care based on parental abuse, and the court held a trial on the matter. As in Vermont, the standard of proof in Louisiana at such a proceeding is a preponderance of the evidence. Medical experts testified that the brain bleed was caused by trauma, that it could not have been caused by the child's birth, and that the child was a victim of shaken baby syndrome. The baby's parents and grandmother testified that the infant was in their exclusive care since birth, and they could provide no explanation for the injuries other than hypothesizing that they were caused by a difficult birth. The trial court concluded that the Department had failed to prove that the child was in need of care, citing the lack of certainty of the medical evidence, and nonmedical factors such as the loving nature of the parents, lack of evidence of other abuse, and parents' prompt action in seeking medical attention. Id. at 197.
¶ 39. The appellate court reversed, noting that even though the medical experts could not explain exactly how the infant was injured, they were in agreement that the injury was caused by abuse. Id. The court emphasized that the uncontroverted medical evidence demonstrated that "some type of external trauma injured this infant on more than one occasion while in the exclusive care and control of his parents and grandmother." Id. As to the nonmedical evidence, the appellate court explained: "We must not allow a trial court's *412 belief in the `goodness' of the parent(s) to overshadow the overwhelming medical evidence that this child sustained serious and even life-threatening injuries sometime between his release from the hospital following his birth and nearly four weeks later...." Id.
¶ 40. The facts compel a similar conclusion in this case. The State presented medical proof that Z.L. was injured by nonaccidental means. As factfinder, the trial court certainly could have found that the State's experts were not credible or that the parents' medical experts were more convincing. The court concluded that it was not, however, persuaded by the parents' experts and that "a fall involving M.L. was probably not the cause of the extensive acute damage to the skull and brain." The court further concluded that the State's experts were more persuasive and that Z.L.'s injuries "were probably the result of non-accidental means." Having reached this conclusion, it was beyond the court's discretion to ignore its findings because the parents also appeared to be good people. Under our standard of proof, competent, credible medical evidence of abuse cannot be overcome by testimony that parents appear to be caring and attentive. See In re Marcus H., 297 Ill. App.3d 1089, 232 Ill.Dec. 120, 697 N.E.2d 862, 867 (1998) (reversing trial court's conclusion that infant was not abused even though the court found medical evidence credible that baby's injuries were not consistent with an accident and explaining that once the trial court found that the injuries were sustained by nonaccidental means the court could not disregard this medical evidence). The conclusions the court reached based upon the direct medical evidence are the most important in its analysis. As outlined above, a CHINS finding is compelled once the court finds that a child has suffered nonaccidental injuries while in a parent's care. See In re J.R., 164 Vt. at 270, 668 A.2d at 673. On these facts, the court's finding that the State's account of Z.L.'s injury was more probable must result in a CHINS conclusion. See Livanovitch v. Livanovitch, 99 Vt. 327, 328, 131 A. 799, 800 (1926) (explaining that a preponderance-of-the-evidence standard is met when "the beam inclines toward him who has the burden, however slightly"). No conclusion other than that Z.L. was abused is possible from this finding.
¶ 41. The trial court appeared unable to accept that parents, whom witnesses presented as attentive and caring parents, could have been capable of inflicting the injury that the medical evidence indicated Z.L. had suffered. The fact that parents were viewed positively by community members is not irreconcilable, however, with the State's theory of abuse, as the court appears to suggest. Child abuse is a pernicious societal problem that may afflict families of every strata and commonly occurs in private, closed settings. Individuals who appear to be "good parents" can abuse their childreneven if only in a momentary loss of temperand parents can abuse one child and not the other. Indeed, given the findings of the trial court, that is the only rational explanation for what occurred here.
¶ 42. The trial court's finding that Z.L. was not injured by a fall with M.L. and its concurrent conclusion that Z.L. was not abused were not reconciled by the court and left unanswered the key question of what happened on the day that Z.L. was injured and what caused his previous injuries. Given the court's determination of the credibility of the medical evidence, the only answer to this critical question is that Z.L. was abused by his parents. General evidence about parents' apparently good nature cannot diminish the "compelling" nature of the State's medical evidence regarding *413 the specific injuries inflicted here, or enhance the plausibility of parents' theory, which the court rejected as merely possible, but not probable. See Porter v. Am. Exp. Lines, Inc., 387 F.2d 409, 410 (3d Cir.1968) ("Factual determination rests on probability.").
¶ 43. In sum, the court's findingsthat Z.L.'s injuries were the result of nonaccidental serious head trauma and that Z.L. was under the exclusive care of his parents during the time of his injuriessupport only one conclusion: that it is more probable than not that Z.L. suffered abuse at the hands of his parents. I would therefore reverse the trial court, and order that Z.L. and M.L. are CHINS.
NOTES
[1] As one of the medical experts explained, the brain is covered by a series of membrane layers. One tough membranethe outside of the brainis called the dura. A subdural hemorrhage is bleeding below the surface of the dura over the surface of the brain.
[2] The statutes relating to juvenile proceedings were recently amended. See 2007, No. 185 (Adj. Sess.) (effective January 1, 2009). The relevant provision defining CHINS has been renumbered and now appears at 33 V.S.A. § 5102(3)(A)-(B).
[3] As stated by the majority, the juvenile statutes have recently been amended and this provision now appears at 33 V.S.A. § 5102(3). Ante, ¶ 6 n. 2.
[4] The trial court was critical of the State's lack of any expert testimony on the exact amount of force necessary to break an infant's skull or created by an eighty-pound child falling on an infant. While none of the State's experts provided this information in terms of numbers, equivalent evidence was admitted in another form. The State was not limited to proof of the precise numbers that identify the force that would be created by M.L. falling on Z.L. to prove that the fall did not cause Z.L.'s extensive injuries. Instead, the State's experts concurred that it was simply impossible for an accidental fall involving a child of a weight equal to M.L. to have caused Z.L.'s injuries. The experts likened the amount of force necessary to cause Z.L.'s head injuries to the forces created from: a car accident, falling down a long flight of stairs, a ski accident, or shaking or throwing a child. Although the family court may have wished it had more specific evidence of how Z.L. was injured, such detail would be cumulative to the evidence provided by the State's experts that was certainly adequate to meet our preponderance threshold for the State's burden of proof, as the majority has correctly defined it. When courts consider the injuries inflicted through child abuse, there frequently is no witness to the event. As another court acknowledged, there are rarely eyewitnesses to child abuse, and therefore these cases often rely on medical expert testimony and circumstantial evidence. See State v. Goblirsch, 309 Minn. 401, 246 N.W.2d 12, 14 (1976).