VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.    21-AP-203



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

AUGUST TERM,  2022

| | |
|---|---|
| In re M.E. & T.E., Juveniles<br>(D.E., Mother\*) | }    APPEALED FROM:<br>}<br>}    Superior Court, Chittenden Unit,<br>}    Family Division<br>}    CASE NOS. 487-11-19 Cnjv; 488-11-19 Cnjv<br>     Trial Judges: Thomas J. Devine;<br>     Kirstin K. Schoonover |

In the above-entitled cause, the Clerk will enter:

Mother appeals pro se from the trial court's determination that M.E. and T.E. are children in need of care or supervision (CHINS). We affirm.

M.E. and T.E. are twins born in November 2004. Father died by suicide in September 2019. The boys had a poor relationship with mother leading up to father's death, and the relationship deteriorated further after his death. In November 2019, the State filed petitions alleging that the children were CHINS due to a lack of proper parental care. The children were placed in emergency custody of the Department for Children and Families. Numerous hearings followed, and the children were continued in DCF custody. In August 2021, the court found the children to be CHINS.

In its decision, the court recounted the history that led to the filing of the CHINS petitions. It explained that around August 2018, mother developed a belief that father molested the children. The children, who were then thirteen years old, vehemently denied that any abuse occurred. Mother made a report to DCF about risk of sexual abuse, but the report was not accepted. The police interviewed the boys, and they again stated that no abuse occurred. Mother then took the boys to the hospital to be examined by a doctor for possible sexual abuse. This greatly distressed the children given their repeated denials of abuse. The doctor declined to conduct a SANE exam given the children's clear and unequivocal denial of any abuse. During the visit, the doctor developed concerns about mother's presentation. Before releasing the children to mother, the doctor contacted a pediatrician who knew the family and received reassurances that the pediatrician would work closely with the family in the days to come. Following this appointment, mother took the boys to a hotel rather than taking them home, and she did not allow them to contact father. The boys began to feel increasingly frustrated and powerless.

The following morning, a school day, the police were waiting in the hotel lobby to drive the boys to mother's car. Mother had reported to police that the children were in a state of "heightened aggression." Before being allowed in the police car, the boys were patted down and searched, and an officer removed one boy's house keys. Mother did not apologize to the boys for subjecting them to this treatment or apologize for the confiscation of the house keys. Once they were in mother's car, mother drove the boys to the Chittenden Unit for Special Investigations (CUSI) for another round of questioning even though the boys wanted to go to school. The boys were separately interviewed at CUSI, and they again stated that no sexual abuse had occurred. Mother's behavior led to a significant deterioration in her relationship with the boys.

At the CHINS merits hearing, mother insisted that she never accused father of sexually abusing the boys. The court found that, while that might be true in a technical sense, mother perseverated in the belief that the children were abused. Her relationship with the children was damaged by her inability to accept the repeated assurances of various professionals and the children's own statements that they were not abused. Mother's failure to discuss with the children why she had taken the steps she did also contributed to the deterioration of the parties' relationship.

Not long after the CUSI interviews, the boys were interviewed by their pediatrician. The pediatrician did not find evidence of sexual abuse. The doctor recommended that the children engage in counseling and encouraged mother to admit herself to the hospital for a mental health assessment, which mother agreed to do. After mother was discharged from the hospital, she moved to a garage apartment in the family home. Father tried to keep distance between mother and the boys. He helped the boys put chain locks on their bedroom doors to prevent mother from barging into their rooms. Mother began videorecording father and the boys and continued to do so despite their requests to stop.

Mother's therapist believed mother had adjustment disorder with anxiety, and the court so found. No evidence was presented regarding how mother's condition affected her parenting ability, and, in the absence of such evidence, the court did not make any other findings about mother's mental health.

The boys began therapy in September 2018, which they found beneficial. Mother told the boys' therapist that father was sexually abusing and cutting the boys. The therapist was concerned about mother's presentation. Mother excitedly waived a sheaf of papers at her and exhibited rapid, pressured speech and tangential thinking. The therapist reported mother to DCF as posing a possible risk of harm to the children. The therapist recommended limited parent-child contact (PCC) with mother. Mother had very little contact with the boys at that point; the boys were primarily in father's care.

Mother filed for divorce in May 2019, about six months before the CHINS petitions were filed. As previously noted, mother moved into the garage apartment and largely stayed in her own unit. Father and the boys stayed in the main house. The situation in the house was very tense and fraught with conflict.

In connection with the divorce case, the boys were ordered to have additional contact with mother, which they resented and which caused them stress. After father's death by suicide on September 24, 2019, the boys threw themselves into their activities but found it harder and harder to keep up with their schoolwork. They boys stayed with a neighbor for a few days and returned to find that mother had moved into the main house in the bedroom across from theirs.

2

Her proximity alarmed the boys. Mother had also packed up all of father's belongings, which they found distressing. Mother engaged in other actions that caused the boys stress and fear, such as berating them through their closed bedroom door and staring at them when they did their homework downstairs. When at home, the boys spent most of their time in their room. Mother would not take the children to see their established therapist, despite multiple requests from the children. The court found that mother blocked the boys from seeing their therapist and that, in the weeks after father's death, the children had significant unmet emotional and mental health needs.

Based on these and other findings, the court considered whether "whether, given all of the circumstances," the children were "without proper parental care, such that [their] well-being [was] threatened." In re J.C., 2016 VT 9, ¶ 16, 201 Vt. 192 (quotation omitted); see also 33 V.S.A. § 5102(3)(B) (defining "[c]hild in need of care or supervision" as child who is "without proper parental care or subsistence, education, medical, or other care necessary for his or her well-being"). The court recognized that the "primary concern in a CHINS proceeding is to protect a child from future harm." In re M.L., 2010 VT 5, ¶ 33, 187 Vt. 291.

Mother considered her behavior appropriate. The court agreed with the State that, while mother had good reason to seek help when concerns about sexual abuse first arose, mother then refused to listen to the professionals she consulted and refused to believe the children. This led to an erosion of trust. The children were also subjected to increasing stress, tension, and turmoil during the year that parents were trying to live separately in the marital home. Mother pulled away the support of the children's therapist despite their great need for it. The court credited the testimony of the children that their life at home with mother in the weeks leading up to the CHINS petitions was chaotic and anxiety producing. When they retreated to their room, mother yelled at them through the door. One of the boys had breakdowns at school. The boys stayed at school as long as they could to avoid going home. They begged mother to bring them to their therapist, but mother refused. The court concluded that, while the children had food, clothing, and housing, the evidence clearly and convincingly showed that they were in a state of acute distress in the weeks after father's suicide. It concluded that the children were at risk of psychological harm. They were without proper parental care at the time the petitions were filed in that mother was not able or willing to meet their emotional and psychological needs.

The court issued a disposition order in March 2022. It adopted the findings from its CHINS decision and made additional findings. DCF had filed a disposition case plan that sought another planned permanent living arrangement (APPLA). It chose this goal at the children's request. The boys were seventeen at the time, soon to turn eighteen, and DCF did not believe reunification with mother was possible given mother's intransigence in meeting the boys' needs. Mother opposed the plan.

Among other things, the court found that mother challenged DCF and the CHINS process rather than prioritizing the children's needs. A Family Time coach observed and provided support during mother's visitation with the children. Mother became increasingly opposed to taking any suggested cues; she focused on debating the coach rather than giving attention to the boys. Visits became tense and uncomfortable, and they were highly stressful and embarrassing for the boys. During their final visit in April 2021, the boys were visibly upset and articulated their need for space away from mother. When one of the boys walked away, mother followed him against the advice of DCF and the coach. The boys thereafter refused any visitation with mother. Mother did not acknowledge any issues in her relationship with the children and instead blamed DCF. The court found that mother's visits with the boys led to further alienation and

distrust and that the more the boys were around her, the less they wanted to see her. Mother demonstrated no ability to modify her behaviors to respond to the boys' needs, and she did not respect their requests for autonomy. Her behavior further strained her relationship with them and placed the boys at risk of emotional harm when they were around her. The boys did not want to see mother, despite DCF's encouragement to do so, and DCF could not force them to see mother against their wishes. The boys were scared of mother and dismayed by her behaviors. They opposed reunification with her.

Based on these and numerous additional findings, the court concluded that DCF established compelling circumstances for APPLA. It found that the boys were doing well in their current placement; they were mature for their age and thoughtful. They attended school and were doing well academically. They were working, happy, and safe. The children did not want to return to mother's care, and they had not seen her in person on a consistent basis for almost a year. They would soon be eighteen. Mother wanted the boys to be immediately returned to her custody, but she displayed no insight into the boys' needs or their fears of reunification. She remained unable to meet the boys' actual needs as opposed to her own needs. Her behavior placed the boys at risk of emotional harm. At the hearing, DCF indicated its willingness to include a concurrent plan of reunification with mother and provide her with services to support that plan. The court ordered DCF to file an updated disposition and permanency case plan with these concurrent goals, which it did.

The court subsequently issued a decision on various motions filed by mother, discussed in additional detail below. This appeal followed.

Mother first challenges the court's determination that the children were CHINS. She argues that she is an outstanding parent and that she was meeting the children's needs. She contends that she did not place the children at risk of harm by refusing to take them to see their therapist after father committed suicide. She questions whether DCF is addressing the children's mental health needs and whether DCF applied a double standard regarding mental health treatment.

As set forth above, a child is CHINS if he or she is "without proper parental care or subsistence, education, medical, or other care necessary for his or her well-being." 33 V.S.A. § 5102(3)(B). The State need not show that a child has suffered actual harm, only that the child is at risk of harm. In re L.M., 2014 VT 17, ¶ 29, 195 Vt. 637. On review, we will uphold the family court's findings if they are supported by any credible evidence and "we will uphold the court's legal conclusions where supported by its findings." In re M.L., 2010 VT 5, ¶ 8. It is the exclusive role of the trial court "to weigh the evidence and assess the credibility of witnesses." Id. ¶ 29.

While mother contends that she was providing proper care to the boys, the court concluded otherwise. The court did not base its decision on educational neglect, as mother suggests. It found that the boys were highly intelligent and good, conscientious students who worked hard. The court based its decision on the risk of emotional harm given that mother was not meeting their emotional and psychological needs. It did not conclude that the boys were CHINS simply because the State wanted them "to see a particular medical provider." DCF's decisions regarding mental health treatment for the boys while in DCF custody, or decisions about the courses that the boys take at school, have no bearing on the court's CHINS determination.

4

As summarized by the trial court, a confluence of factors led to mother's inability or unwillingness to meet the boys' emotional and mental health needs. In the weeks leading up to the filing of the CHINS petitions, the boys' emotional and mental health needs were going unmet such that they were at risk of significant emotional harm. They wanted to meet with their therapist with whom they had an established relationship, but mother refused their repeated requests. The court made ample findings in support of these conclusions, and its findings are supported by the record. Mother does not challenge any finding as clearly erroneous. Essentially, mother wars with the court's assessment of the evidence, and this Court does not reweigh the evidence on appeal. Her disagreement with the court's determination does not show an abuse of discretion. See, e.g., Meyncke v. Meyncke, 2009 VT 84, ¶ 15, 186 Vt. 571 (explaining that arguments which amount to nothing more than disagreement with court's reasoning and conclusion do not make out case for abuse of discretion).

Having concluded that the court did not err in finding the children were CHINS, we reject mother's related assertions that the court applied an inappropriate or unclear standard in reaching its decision or that it lacked "legal or reasonable cause" to reach the conclusion that it did. The court looked at the children's individual circumstances in making its decision, it applied the appropriate standard, and its decision is supported by the record.

Mother next asserts that: she was not given credit for seeking help when father appeared suicidal; the court should not have limited her contact with the boys; she was not given sufficient time to present her case; she did not have full access to court records; and the case unfolded in an unfair way, including a delay in issuing a CHINS merits decision and the timing of witness testimony.

As to mother's first argument, the relevance of, if any, and weight to be given to such information, is for the trial court to ascertain. Mother does not provide any record support for her assertion that she was not provided sufficient time to present her case. The trial court largely considered and rejected mother's remaining arguments in a March 2022 decision denying various motions that mother filed. Mother asserted below, in part, that she had not been able to fully access the documents in the children's cases and that the disposition hearing was too short, and she raised other claims that allegedly demonstrated the flawed processing of these cases to her disadvantage. She argued that the remedy for these alleged violations was the immediate return of the children to her custody.

The trial court found that, to the extent mother alleged a denial of visitation or contact, these allegations were addressed at a January 2022 hearing on the children's motion to suspend PCC. The evidence presented at that time, including testimony from the children themselves, was that contact was not denied by DCF per its sole discretion but was suspended at the request of the juveniles. Thus, absent evidence to the contrary, the court found that any suspension of visitation appeared to represent DCF's protection of the children's rights and respect for their health and interests. In its January 2022 order, moreover, the court ordered that visitation should occur as recommended by the family therapist or at DCF's discretion, and it otherwise ordered mother not to contact the children and to stay away from them, their foster home, and their school unless approved by DCF.

With respect to the issue of delay, the court noted that the time limits established by statute "are directory and not jurisdictional." In re H.T., 2020 VT 3, ¶ 28, 211 Vt. 476 (quotation omitted). To the extent that any delay could be found to constitute error, and even if the court were to consider the representations in mother's affidavits, mother failed to show prejudice

5

caused by the delay. As to the procurement of records, the court found that mother failed to demonstrate that the procedure for accessing records was inconsistent with due process. Finally, the court found that while mother asserted various substantive and procedural due process errors, she did not provide evidence to support her claims. It thus had no evidentiary basis to rule on any of her claims of due process violations.

In sum, the court found that mother presented no evidence to support her claims and no legal argument as to why, even if procedural or substantive violations were established—which they were not—such violations would constitute a basis to dismiss the CHINS cases and vacate all prior orders. It thus denied her request for relief.

Mother offers no basis to disturb the court's rulings on these points. She essentially reiterates arguments that were considered and rejected below. The trial court had discretion in considering whether to limit mother's contact with the children and it provided a reasoned basis for its decision. It provided a reasonable basis with respect to the other conclusions cited above. Mother has not shown that she was denied a fair opportunity to present her case or that she objected to the order in which the witnesses were presented at the merits hearing below. Even if she had objected, the court may "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence." V.R.E. 611(a). We have considered all of the arguments discernable and adequately briefed by mother, and we find them all without merit.

Affirmed.

BY THE COURT:

Karen R. Carroll, Associate Justice

William D. Cohen, Associate Justice

Nancy J. Waples, Associate Justice