VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.    23-AP-272

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JANUARY TERM,   2024

In re P.B., Juvenile
(D.P., Mother\*)

}
}
}
}
}
}

APPEALED FROM:

Superior Court, Caledonia Unit,
Family Division
CASE NO. 21-JV-01439
Trial Judge: Thomas J. Devine

In the above-entitled cause, the Clerk will enter:

Mother appeals from the trial court's determination that daughter P.B. is a child in need of care or supervision (CHINS).  We affirm.

The trial court made the following findings.  P.B. was born in September 2020 when mother was seventeen years old.  Mother lived with P.B. and P.B.'s putative father in the home of putative father's parents.[*]  In September 2021, father was charged with domestic assault of mother; the alleged assault occurred in P.B.'s presence.  Father was released on conditions, including that he have no contact with mother.

Mother's friend testified that mother's relationship with father was marred by violence.  She observed incidents of domestic violence between parents, sometimes in front of P.B., including spitting, hitting, and name-calling.  She saw father blowing smoke at P.B.  In the weeks leading up to the filing of the CHINS petition, mother told her friend that she was increasingly distressed about her relationship with father and her living situation.  The court found that the parties' arguments and altercations escalated during this time, including arguments in front of P.B.  The arguments were serious enough that mother at times feared for her safety.

---

[*] For convenience, we refer to putative father hereafter as father.

In mid-October 2021, mother had a video chat with her friend. She told the friend that there was no food in the house and she showed the friend empty cupboards. Mother said that she was afraid to leave her room because of father's parents. The friend saw a makeshift crib or enclosure in the corner, dog feces on the floor, and six or seven diapers on the floor, some of which contained maggots. The friend was very concerned for P.B.'s safety and contacted the Department for Children and Families (DCF). While mother denied that the conversation above occurred, the court noted that mother had posted a video online indicating that she and P.B. had no food and asking for financial help. The court rejected as not credible mother's assertion that she made this video just for fun. It found that mother posted this video because she needed help. The court credited the friend's description of mother and P.B.'s bedroom. It found that the room where P.B. slept was unhygienic and unsafe.

A DCF Family Services worker made an unannounced visit to the home. Mother, father, and P.B. were there notwithstanding father's conditions of release. Mother and P.B. went to a neighbor's home and did not return during the employee's visit. Father showed the DCF employee a room that he claimed was P.B.'s room, though when pressed, he admitted that it was not. The worker was bitten by a small dog while in the home and, when she was shown to father's actual bedroom, there were two large dogs on the bed. The bedroom was very cluttered and dirty; the worker saw a highchair in the corner. Father told the employee that P.B. slept in a different room. The court found father evasive in his discussion with the employee and determined that P.B. likely slept in the cluttered room with the highchair. Father and mother continued to have contact with one another despite father's conditions of release. The court found that mother's ongoing contact with father and her inclusion of P.B. in that contact placed P.B. at risk of serious harm.

Following this visit, DCF engaged in safety planning with mother. Mother denied any domestic violence but agreed to stay with her friend. The friend observed mother being rough with P.B. and allowing P.B. to cry without comforting her for an extended period. P.B. also had a bad diaper rash when she arrived at the friend's house. Mother and P.B. left the friend's house within a day or two of arriving there. DCF then filed a CHINS petition.

Based on these and other findings, the court concluded that P.B. was CHINS. With respect to the living conditions in the home and domestic violence, the court credited the testimony of mother's friend. It rejected mother's contrary testimony as not credible, finding it undermined by other evidence in the case. The court also rejected mother's assertion that DCF had acted precipitously in filing a CHINS petition. It found that mother was deeply ambivalent about the need to stay away from father and that father had repeatedly demonstrated his willingness to violate his conditions of release. Mother lacked a support system and had few resources and the court found it unclear whether she would abide by DCF's safety plan. The court concluded that the evidence fairly and reasonably established that, at the time the petition was filed, P.B. was at significant risk of harm from exposure to domestic violence in the home. She lacked proper parental care or subsistence, education, medical, or other care necessary for her well-being. See 33 V.S.A.§ 5102(3)(B). Mother appealed.

Mother contends that the court's findings are insufficient to support its conclusion that P.B. was CHINS. She argues that there was no evidence to show that P.B. was harmed or at risk of harm from domestic violence between parents, notwithstanding P.B.'s presence during their altercations. Mother asserts that she should not be faulted for failing to follow DCF's safety plan once she left the home where father was living. Finally, mother argues that, even if domestic violence was established, the court did not find that she would fail to protect P.B. from harm. She states that father's willingness to violate his conditions of release is outside of her control.

We reject these arguments. As indicated above, a child is CHINS if the child lacks "proper parental care or subsistence, education, medical, or other care necessary for his or her well-being." Id. The State must establish by a preponderance of the evidence that a child is CHINS. Id. § 5315(a). "Because the critical focus in a CHINS proceeding is on the child's well-being, the State is not required to demonstrate that the child has suffered actual harm, but rather is subject to a risk of harm." In re J.C., 2016 VT 9, ¶ 7, 201 Vt. 192. "On review . . . we will uphold the court's findings of fact unless they are clearly erroneous; we will uphold the court's legal conclusions where supported by its findings." In re M.L., 2010 VT 5, ¶ 8, 187 Vt. 291. "We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." In re A.F., 160 Vt. 175, 178 (1993).

The court's findings support its conclusion here. As set forth above, the court found that P.B.'s living environment was unsafe and unhygienic. There were dog feces on the floor in her room, as well as diapers full of maggots. There was insufficient food in the home. Mother and father repeatedly engaged in violent altercations and arguments in P.B.'s presence, arguments that caused mother to fear for her own safety. Mother was deeply ambivalent about the need to stay away from father, she lacked a support system and had few resources, and the court was not convinced that she would follow the safety plan and stay away from father. In other words, the court was unpersuaded that mother would protect P.B. from harm. The court did not punish mother for being a domestic-violence victim, as she suggests. It properly focused on the risk of harm that mother's behavior posed to P.B. The court's findings are supported by the record and they support the court's conclusion that mother's ongoing contact with father and her inclusion of P.B. in that contact placed P.B. at risk of serious harm.

This case is not like In re A.O., 2023 VT 54, ¶ 13, cited by mother. In that case, the trial court's "decision rested largely on its general and nonspecific finding that witnessing domestic violence harms children." Id. There was one particular incident of domestic assault at issue in that case, and the court "did not make a specific finding that these particular children had been harmed by or were at risk of harm from witnessing the violence [that their father] directed at [their] mother," nor did the court make any "findings about the children's proximity to that altercation." Id. (emphasis omitted). "There was also no evidence that the children lacked basic necessities, medical care, or education, or that conditions in the home were unsanitary or unsafe for the children." Id. ¶ 12.

In this case, by contrast, the court made specific findings that P.B. was present during multiple violent incidents between parents, where parents engaged in hitting, spitting, and name-calling. The arguments escalated in the period leading up to the filing of the CHINS petition and

caused mother to fear for her safety.  Mother nonetheless denied that any domestic abuse occurred, and she was ambivalent about keeping away from father.  The court also found that P.B.'s living area was unsafe and unsanitary.  The court did not err in concluding that mother's continued involvement with an individual who allegedly perpetrated violence against her in the presence of P.B. raised significant concerns for P.B.'s well-being and created a risk of harm.

Affirmed.

BY THE COURT:

Paul L. Reiber, Chief Justice

Karen R. Carroll, Associate Justice

William D. Cohen, Associate Justice

4