2014 VT 17



In re L.M., Juvenile (2013-355)

 

2014 VT 17

 

[Filed 14-Feb-2014]

 

NOTICE:  This opinion is subject
to motions for reargument under V.R.A.P. 40 as well as formal revision before
publication in the Vermont Reports.  Readers are requested to notify the
Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont
Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors
in order that corrections may be made before this opinion goes to press.

 

 


 2014 VT 17
 
  


 No. 2013-355
 
  


 In re L.M., Juvenile
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
  
 
 
 Superior Court, Franklin Unit,
 
 
  
 
 
 Family Division
 
 
  
 
 
  
 
 
  
 
 
 December Term, 2013
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Geoffrey
 W. Crawford, J.
 
 
  
 
 
 Matthew F. Valerio, Defender General, and Rebecca Turner,
 Appellate Defender, Montpelier,
   for Appellant Father.
  
 William H. Sorrell, Attorney
 General, and Martha E. Csala, Assistant Attorney General,
   Montpelier, for Appellee.
 
  

 

PRESENT:   Reiber, C.J., Dooley, Skoglund and Robinson, JJ.,
and Davenport, Supr. J.,

                     Specially Assigned

 

 

¶ 1.            
REIBER, C.J.   Father appeals from the trial court’s order
finding his daughter L.M. to be a child in need of care or supervision
(CHINS).  He raises numerous arguments.  We affirm.

¶ 2.            
The record indicates the following.  L.M. was born in June 2010.  On May
31, 2013, the Department for Children and Families (DCF) filed a petition
alleging that L.M. was CHINS.[1] 
The court issued a temporary care order on June 4, 2013, assigning temporary
legal custody of L.M. to her paternal grandmother subject to a conditional
custody order.  Mother later stipulated that L.M. was CHINS due to mother’s drug
use and homelessness.  Father did not agree that L.M. was CHINS, and his
attorney indicated that he might contest mother’s stipulation to the extent that
it affected father’s situation.  

¶ 3.            
Neither parent attended the September 4, 2013 CHINS merits hearing.  Father’s
mother, who had been caring for L.M. since May 31, 2013, the date the CHINS
petition was filed, and a DCF social worker testified at the hearing.  The DCF
worker said that she first met with parents in March 2013 after DCF received a
report about the family.  At that time, parents were staying with mother’s
sister, the sister’s boyfriend, and the sister’s three children.  Parents were
sleeping on a couch in the living room.  L.M. was sleeping in the top bunk of a
bunk bed. 

¶ 4.            
During this March meeting, the social worker reviewed with parents the
report that had been made to DCF.  She also discussed DCF’s history of involvement
with the parents and the pattern of homelessness, drug use, transience, and
instability as evidenced by prior reports.  Parents acknowledged that their
behavior fell into a repetitive pattern.  Father recounted the family’s housing
history over the prior two years, explaining that they had been kicked out of
or lost two homes, stayed in shelters, been kicked out of a shelter, stayed at
father’s brother’s house temporarily, and eventually ended up in mother’s
sister’s home.  Father also described his drug-use history.  Father stated that
he had been using opiates for the past ten years and that he was currently
addicted to opiates.  Father said he had been self-medicating with Suboxone he
purchased on the street for approximately ten months and that he was on a
waiting list for a program that provided Suboxone to opiate addicts.  

¶ 5.            
Following this March conversation, the social worker recommended daycare
for L.M.  She also strongly recommended that father obtain a substance abuse
evaluation so that he could move forward with treatment, including obtaining a Suboxone
provider.  At that point, father was candid about the family’s struggles with
drugs and homelessness, and he was open to placing L.M. in daycare and working
with DCF.  Parents agreed to schedule substance-abuse assessments, and mother
agreed to contact someone about obtaining daycare.  Father supported the daycare
plan.  

¶ 6.            
On May 3, the social worker made an unannounced visit to mother’s
sister’s home based on a report that mother’s sister was smoking crack in the
basement.  Mother’s sister was not home when the social worker arrived, but
mother showed the social worker the basement.  The social worker saw no
evidence of crack use.  Mother stated that no one smoked crack in the basement,
but acknowledged that the adults sometimes smoked marijuana there.  The social
worker testified, over father’s counsel’s objection, that mother later told her
that she and father had smoked crack in the basement once.  

¶ 7.            
The social worker told parents during this visit that DCF would be
opening a case because parents failed to follow through on any of DCF’s
recommendations.  She explained that DCF’s recommendations had been designed to
mitigate the family’s risk factors and, when DCF’s risk assessment tool was
applied, the family continued to have a high risk score.  Father was angry that
a case would be opened.  The social worker also informed the parents that a
family safety planning meeting would be set up to address the concerns that father
had already acknowledged existed and had not been addressed.  The social worker
informed mother of the date and time of this meeting, and, at mother’s
direction, she left father a voicemail message with this information.  Neither
parent appeared at the meeting.

¶ 8.            
The social worker followed up numerous times with parents between March
and May.  She located a possible Suboxone provider for father, though services
were dependent on father obtaining a substance abuse evaluation.  Father did
not provide the social worker with a substance abuse assessment by the date
that the CHINS petition was filed.  He did not enroll L.M. in daycare.  He did
not obtain stable housing.  

¶ 9.            
At the time the CHINS petition was filed, father and mother were not
living together.  The social worker testified that L.M. was with mother at the
time the petition was filed.  As the social worker began to elaborate, father’s
attorney objected on hearsay grounds.  The court overruled the objection, finding
mother’s statements to the social worker to be nonhearsay as admissions of a
party-opponent under Vermont Rule of Evidence 801(d)(2).  The social worker
then testified that two days before the CHINS petition was filed, mother
informed her that she and L.M. were homeless.  Mother explained that the family
had left mother’s sister’s home after a fight, and that mother and L.M. had
nowhere to go.  Mother said that father was staying with his relatives, and
those relatives had made it very clear that there was no room for mother or
L.M.  This evidence was later disputed.  Father’s mother testified that father
told her that L. M. was with him during this period. 

¶ 10.        
The grandmother further stated that father had asked her if L.M. could
stay with her given the CHINS petition being filed.  She testified that L.M.
began living with her either the day the petition was filed or the day after.  The
grandmother explained that until the day the CHINS petition was filed the
parents had asked her to take care of L.M. on many occasions and then changed
their minds and decided to keep her themselves.  

¶ 11.        
The grandmother acknowledged father’s ongoing struggle with drugs and
with obtaining housing.  She testified that parents had asked to stay with her
but she refused.  She explained that she had helped parents before, when mother
was pregnant with L.M. and again when she was a year old, but parents always
fell into the same pattern—parents made promises but never followed through.  The
grandmother had also helped parents get set up in an apartment but that also
fell through and parents lost everything.  Given parents’ repeated behavior,
the grandmother told parents that she would care for L.M. but she would not take
them into her home as well.  The grandmother testified that it was not until
the court became involved that parents said that L.M. could come and stay with
her.  

¶ 12.        
The court found on the record that the State met its burden of proof
with respect to a CHINS finding against father.  It was undisputed that father
had a longstanding serious history of abusing street drugs that he could not
bring to a favorable resolution.  Father also had a chronic problem with
homelessness, and, at the point in question, was unable to care properly for
L.M., unable to provide a stable home, and unable to follow through on any
recommendations or offers of help from DCF.  The court recognized that father’s
mother had stepped up to care for L.M., but concluded, this did not change the
fact that grandmother had agreed to help as a matter of family emergency in
response to the CHINS petition.  It similarly did not change the history of the
months leading up to the filing when father, who has a serious drug problem, was
simply unable to provide appropriately for L.M.’s care.  For these reasons, the
court entered a finding of CHINS regarding father, adding that mother had
already admitted that L.M. was CHINS for similar reasons.  Following the
issuance of a written order, this appeal followed.

¶ 13.        
Father argues on appeal that the court’s decision lacks evidentiary
support and is contrary to the undisputed evidence.  According to father, the State’s
case rested on inadmissible hearsay.  Father also asserts that the court could
not enter a CHINS finding because L.M. was living with her grandmother on the
date that the CHINS petition was filed and her needs were being met.  Finally,
father argues that there was no evidence to show that his drug addiction, chronic
instability, and failure to follow through on DCF’s recommendations, posed a
threat to L.M.’s well-being.  

¶ 14.        
We begin with the hearsay issue.  Father argues, and the State appears
to concede, that the court erred in allowing the DCF social worker to testify
to statements that mother allegedly made to her.  These included, among other
things, mother’s statements concerning her own and father’s noncompliance with
DCF’s recommendations; mother’s statements that she and father had smoked crack
while staying with mother’s sister; and mother’s statements to the social
worker, shortly before the CHINS petition was filed, that she and L.M. were
homeless and that father was staying with relatives who had made it very clear
that there was no room for mother or L.M. 

¶ 15.        
The State argued below that these statements were nonhearsay under Rule
801(d)(2) as admissions by a party-opponent.  Father’s attorney disagreed,
arguing that mother was no longer an adverse party given that she had
stipulated to CHINS.  The court agreed with the State that mother remained an
adverse party to the State despite her admission to CHINS, and it allowed the
testimony.  

¶ 16.        
The court erred in reaching its decision.  A statement is considered
nonhearsay under Rule 801(d)(2) if: 

The statement is offered against a party
and is (A) his own statement, in either his individual or representative
capacity, or (B) a statement of which he has manifested his adoption or belief
in its truth, or (C) a statement by a person authorized by him to make a
statement concerning the subject.

The statements at issue here plainly
were not father’s own statements, as required by the rule, nor were they
statements that fell within either of the remaining two relevant provisions of
the rule.  Mother’s statements were not being offered against mother as mother
had already admitted that L.M. was CHINS due to mother’s drug use and
homelessness.  We find no grounds for allowing mother’s statements to be used
against father under Rule 801(d)(2).  See In re Ty.B., 878 A.2d 1255,
1261-62 (D.C. 2005) (rejecting notion that mother’s out-of-court admissions
could be used against father in child neglect proceeding on basis of “privity
of obligation,” or other grounds); see also In re Care & Prot. of Sophie,
865 N.E.2d 789, 796 (Mass. 2007) (in child neglect case, rejecting argument
that children’s out-of-court statements were admissible against father as
admissions of a party opponent as rule of evidence “makes clear that its
definition of nonhearsay extends only to the offer of an extrajudicial
statement against the declarant” (citing McCormick, Evidence § 262, at 777
(3d ed. 1984) (“If there are several parties on one side of the litigation,
whether plaintiffs or defendants, the admission of one of these co-parties is
admissible only against himself.  It is not admissible merely by virtue of the
co-party relationship against the other parties with whom he is aligned.”))).  

¶ 17.        
This conclusion is consistent with the purpose of the rule.  See
Reporter’s Notes, V.R.E. 801 (explaining that “[a]dmissions are treated as
nonhearsay because they come in as a by-product of the adversary system,” and
recognizing that hearsay purpose of cross-examination is satisfied “because the
party uttering the statement can scarcely cross-examine himself, although he is
free to take the stand to explain the statement”).  As one court has explained,
the hearsay rule, which “ensure[s] that parties can test all the testimony
against them through cross-examination[,] is not relevant when the testimony is
the party’s own.”  In re V.N.W., 292 P.3d 548, 554 (Or. 2012) (en banc). 
Mother’s out-of-court statements were inadmissible hearsay under the
circumstances of this case, and they should have been excluded.  

¶ 18.        
Nonetheless, we affirm the court’s decision because we find the error
harmless.  As we have explained, “[t]he erroneous admission of evidence is
grounds for reversal only if a substantial right of the party is affected.”  In
re B.S., 163 Vt. 445, 454, 659 A.2d 1137, 1143 (1995).  In juvenile cases,
where the court has erred in admitting and relying upon certain hearsay
evidence, reversal is appropriate “only if the findings of the court, apart
from the findings based on the improper evidence, d[o] not support the court’s
conclusions.”  Id. (citing In re M.B., 158 Vt. 63, 69-70, 605
A.2d 515, 518-19 (1992) (no reversible error where trial court’s conclusion
based on testimony properly in evidence)); see also In re D.D., 2013 VT
79, ¶ 34, __ Vt. ___, ___ A.3d __ (reiterating that in juvenile
proceedings, court’s decision will not be reversed, even if some of trial
court’s findings are unsupported, “if the remainder of the court’s findings,
which are supported by the record, are sufficient to sustain the decision” (quotation
and brackets omitted)).  We reject father’s suggestion that the State’s case rested
entirely on hearsay; indeed, there does not appear to be any specific finding
in this case based on the hearsay evidence in question.  In any event, there is
sufficient admissible evidence to support the court’s findings, and the court’s
findings support its conclusion that L.M. is CHINS.  See In re D.D.,
2013 VT 79, ¶ 34 (reciting that on review Supreme Court will “uphold the
court’s factual findings unless clearly erroneous and the court’s legal conclusions
when supported by those findings”).

¶ 19.        
As relevant here, a child is “in need of care or supervision” when he or
she “is without proper parental care or subsistence, education, medical, or
other care necessary for his or her well-being.”  33 V.S.A. § 5102(3)(B). 
The State has the burden of establishing by a preponderance of the evidence
that a child is CHINS.  Id. § 5315(a); see also id. § 5315(f),
(g) (trial court must determine if allegations in CHINS petition have been
established).  We apply the preponderance standard of proof in CHINS cases,
rather than the more stringent “clear and convincing evidence” standard
applicable in termination of parental rights cases, because this standard
strikes an appropriate balance between the State’s interest in “ensuring the
‘safety and welfare of the child’ ” and the parents’ interest “in ‘maintaining
family integrity.’ ”  In re M.L., 2010 VT 5, ¶ 7, 187 Vt. 291, 993
A.2d 400 (citation omitted).  This standard is particularly appropriate given
that “parents’ rights are at most temporarily curtailed in a CHINS proceeding.”
 Id.  

¶ 20.        
We stated broadly in In re D.T. that “[t]he issue before the
family court at the merits stage of a CHINS proceeding is a determination of
whether, at the time of the filing of the petition, the juvenile is a child in
need of care and supervision.”  170 Vt. 148, 156, 743 A.2d 1077, 1084 (1999);
see In re R.L., 148 Vt. 223, 227, 531 A.2d 909, 911 (1987) (“The issue
for determination at the merits hearing is whether the State can prove the
allegations in the petition that a child is in need of care and supervision.”
(quotation omitted).[2]
 This does not mean that the court’s analysis is limited only to the child’s
well-being on the precise day that the CHINS petition was filed.  Obviously,
the circumstances leading up to the filing of the CHINS petition are relevant
in the court’s assessment.  This allows the court to have a full picture of the
child’s well-being and to base its decision on all relevant information; it promotes
the care and protection of the child, while not unfairly undermining parents’
interest in maintaining family integrity.  See 33 V.S.A. § 5101(a)(1)
(indicating that juvenile statutes must be construed, among other things, to provide
for care and protection of children coming within its provisions, and to
preserve family if appropriate).  

¶ 21.        
As indicated above, father contends that L.M. cannot be CHINS because
she was living with her grandmother at the time the CHINS petition was filed.  While
we have recognized that a court is not compelled to enter a CHINS
finding whenever a child is being cared for by persons other than a parent or
legal guardian, see In re G.C., 170 Vt. 329, 334, 749 A.2d 28, 31 (2000),
we have never suggested that a child cannot be CHINS, as a matter of
law, under such circumstances.  See id. at 334, 749 A.2d at 32 (upholding
CHINS determination despite fact that child was being cared for in foster-care
arrangement created by mother).  Instead, “the issue is whether, given all of
the circumstances, the child is without proper ‘parental’ care, such that the child’s
well-being is threatened.”  Id.  This is a question of fact, and “each
case must be determined on its own facts.”  Id. (quotation omitted).  

¶ 22.        
In this case, the court recognized that father had arranged for his
mother to care for L.M., apparently on the day that the CHINS petition was
filed or the day after.  As the court made clear, however, this did not change
the underlying and undisputed facts in this case.  It was undisputed that father
had a longstanding, continuing, and serious addiction to street drugs that he
had not been able to resolve.  Father also had a chronic problem with
homelessness.  He did not follow any of DCF’s recommendations, which were designed
to reduce the risk of harm to L.M.  He did not secure stable housing.  Even in
the face of an acknowledged ten-year history of opiate addiction and a need for
treatment, he did not obtain a substance-abuse evaluation while committing to
obtain the same.  Such an assessment would have allowed him to move forward
with treatment.  He did not follow through with the social worker’s
recommendations regarding daycare for L.M. even though he voiced his support of
that recommendation from the first meeting and the social worker afterwards
provided the name of a daycare with an opening.  The lack of follow through
permeates the merits hearing record of father’s story.  The grandmother
testified the reason she refused to let father, and mother, live with her is
because of their failure to keep their promises.  As discussed in additional detail
below, the court’s findings, which are based on admissible evidence, support
the court’s CHINS determination.  

¶ 23.        
Our decision in In re G.C. does not compel a contrary
conclusion.  In that case, a mother who suffered from chronic mental illness
arranged for a foster family to help her care for her infant son.  The mother
created this arrangement while she was pregnant, with the help of her mental
health providers.  Shortly after G.C. was born, the mother attempted suicide.  G.C.
was subsequently adjudicated CHINS.  Mother argued in part that the family
court erred in adjudicating the child CHINS because he had proper “parental
care” through the foster care arrangement.  170 Vt. at 333, 749 A.2d at 31.

¶ 24.        
In considering this argument, we recognized that mother had a carefully
planned arrangement for G.C.’s care, and that the arrangement had been made
with the understanding that, given mother’s past psychiatric history, mother
might be hospitalized or otherwise incapacitated at times, and that during such
periods, the foster family would assume full-time care of G.C.  Nonetheless, we
concluded that the record supported the family court’s CHINS adjudication based
on a variety of factors, including the mother’s inability to care for herself,
let alone a child, without substantial support, as well as the fact that the
foster couple did not have legal guardianship over G.C. and thus could not stop
mother from leaving the foster home with the child if she chose to do so.  Id.
at 334-35, 749 A.2d at 32.  “While there was no evidence that the foster-care
arrangement had failed to provide G.C. support at the time the infant was
removed from the foster family’s home,” we found that the family court had “correctly
focused on the likelihood of prospective harm to the child.”  Id. at 335,
749 A.2d at 32 (quotation omitted).  In light of the mother’s psychiatric
history, we concluded that “the danger of harm to G.C. was substantial enough
for the State to intervene and examine the situation while protecting G.C. from
any potential harm.”  Id. at 335, 749 A.2d at 33.  

¶ 25.        
Unlike the mother in In re G.C., father did not have a carefully planned
arrangement with his mother to care for L.M. during a temporary period of
incapacitation.  Rather, the evidence showed that parents “bounced back and forth”
in their desire to have grandmother care for the child with the ultimate
decision being made contemporaneously with the filing of the CHINS petition.  Father’s
drug abuse and homelessness are longstanding chronic problems, moreover, not
temporary ones.  Additionally, under father’s arrangement with his mother, he
could remove the child from her care at any time.  Under the circumstances of
this case, the court could reasonably conclude that L.M. was “without proper
parental care . . . or other care necessary for his or her well-being,” 33
V.S.A. § 5102(3)(B), notwithstanding father’s last minute placement of the
child with his mother.  In re A.F., 160 Vt. 175, 178, 624 A.2d 867, 869
(1993) (“We leave it to the sound discretion of the family court to determine
the credibility of the witnesses and to weigh the evidence.”).  

¶ 26.        
Father next challenges the evidentiary basis for several of the court’s
findings.  Specifically, father asserts that the court committed clear error in
finding that he has a chronic homelessness problem.  He also contends that the
court relied on inadmissible hearsay testimony to find that he failed to follow
through on any of DCF’s recommendations.  Assuming these arguments fail, father
asserts that the court did not find, and the record does not establish, how his
drug addiction, unstable lifestyle, and failure to follow though with any of
DCF’s recommendations pose a threat to L.M.’s well-being.  

¶ 27.        
We begin with father’s evidentiary challenges, both of which we reject. 
As set forth above, the social worker testified to father’s housing history and
father’s mother similarly recounted father’s ongoing struggle with addiction,
the lack of commitment to treatment, and lack of stable housing.  The evidence
showed that over the course of several years, the family had been evicted from
two homes, stayed in shelters, been evicted from a shelter, stayed at father’s
brother’s house temporarily, and eventually ended up in mother’s sister’s
home.  In a similar vein, father’s mother testified that she had twice allowed
parents to stay with her, but she refused to continue providing them shelter
given their repeated failure to follow through on promises they made.  Indeed, at
the initial meeting with the social worker in March, father admitted to a repeating
pattern of drug abuse and homelessness.  The evidence supports the court’s
finding that father chronically lacked a stable home.  

¶ 28.        
The court’s finding that father was unable to follow though on any of
DCF’s recommendations or offers of help is similarly supported by admissible
evidence.  The social worker testified that by the time the CHINS petition was
filed, she had not received a substance-abuse assessment from father, father
had not obtained stable housing, and L.M. was not enrolled in daycare.  The social
worker also described how she had lined up a potential Suboxone provider for
father, but father failed to take advantage of this opportunity.  

¶ 29.        
The facts found by the court—father’s longstanding and continued drug addiction,
his lack of stable housing, and his failure to follow though—are sufficient to
support its conclusion that L.M. was CHINS.[3] 
The State did not need to establish actual harm.  See E.J.R. v. Young, 162
Vt. 219, 223, 686 A.2d 1284, 1286 (1994) (explaining that “[a]ctual and completed
harmful acts cannot be, and are not, a precondition to a CHINS finding”).  We
note that mother stipulated that L.M. was in need of care or supervision based
on similar factors.  See In re C.P., 2012 VT 100, ¶ 28, __ Vt. __, 71
A.3d 1142 (explaining that “[t]he focus of a CHINS proceeding is the welfare of
the child, and therefore a court may adjudicate the child as CHINS even if the
allegations are established as to one parent but not the other”).  We reject
father’s contention that the court found L.M. to be CHINS simply because parents
are poor.  

¶ 30.        
In reaching its decision that L.M. was “without proper parental care or
subsistence, education, medical, or other care necessary for his or her
well-being,” 33 V.S.A. § 5102(3)(B), the court could properly “draw upon
its own common sense and experience.”  Payrits v. Payrits, 171 Vt. 50,
53, 757 A.2d 469, 472 (2000).  We have observed that “[t]he adverse impacts
upon a child resulting from the drug addiction of the child’s care-giver hardly
needs explanation.”  In re B.C., 169 Vt. 1, 14, 726 A.2d 45, 54 (1999). 
Father contends, by contrast, that a parent’s drug use does not necessarily
have any effect on a child’s well-being, citing out-of-state cases to this
effect.  The undisputed facts in this case, however, show that father has been
addicted to opiates for ten years, that he is self-medicating, and that he is
unable to take advantage of offers of assistance concerning his drug addiction. 
Mother is also addicted to drugs, and she has conceded that her drug use
renders her incapable of caring appropriately for L.M.  See Young, 162
Vt. at 222-23, 686 A.2d at 1286 (“[T]he central concern in CHINS proceedings is
the ability of the parents to render appropriate and necessary care for the
child’s well-being.”).  It was reasonable for the court to conclude that father’s
opiate addiction poses a risk of harm to a toddler’s well-being, including
having a negative impact on father’s ability to provide adequate supervision.  

¶ 31.        
While father’s unstable living situation, standing alone, might not be
sufficient to support a CHINS determination, it adds another element of risk
under the facts of this case, raising the prospect, given father’s repetitive
pattern of haphazard moves, that father and L.M. could end up in an unsafe
living situation.  Father’s inability to follow through on DCF’s recommendations—recommendations
designed to promote L.M.’s safety—similarly enhances the potential risk of harm
to L.M.’s well-being.  Given all of these factors, including mother’s concession,
we conclude that the record supports the court’s decision that there was a risk
of prospective harm to the child sufficient to justify the State’s temporary
intervention to ensure that L.M. is safe. 

¶ 32.        
Thus, we reject father’s assertion that the CHINS adjudication must be
vacated and the CHINS petition dismissed.  

Affirmed.

 

 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Chief
 Justice
 
  

 

¶ 33.        
ROBINSON, J., dissenting.   The State’s authority to interfere
with the parent-child relationship in the name of protecting children is
“awesome,” and is accordingly subject to rigorous statutory and constitutional
restraints.  In re N.H., 135 Vt. 230, 235-37, 373 A.2d 851, 855-57
(1977).  “Accordingly, any time the State seeks to interfere with the rights of
parents on the generalized assumption that the children are in need of care and
supervision, it must first produce sufficient evidence to demonstrate that the
statutory directives allowing such intervention are fully satisfied.”  Id. at 235, 373 A.2d at 855.  I cannot agree that the admissible
evidence produced by the State at the merits hearing meets this rigorous
standard.

¶ 34.        
Only two witnesses testified at the hearing: the social worker and
father’s mother.  The social worker and father’s mother both provided testimony
based on their own observations, and both testified about statements that
father had made to them.  The social worker also testified about statements
mother made in conversations the social worker had with mother.  The majority
acknowledges that admission of the social worker’s testimony concerning mother’s
out-of-court statements was error.

¶ 35.        
That leaves two main categories of evidence that might support a CHINS
finding.  First, the State presented evidence that father had a longstanding,
untreated opiate addiction problem.  In particular, the State presented
evidence of father’s own admissions to the social worker that he had been on
opiates since he was sixteen, that he has a current opiate addiction, that he
has been self-medicating with Suboxone for eight to ten months, and that he is
on a waitlist for a Suboxone program in Burlington.  The social worker further
testified that she recommended treatment options to father, and she urged him
to undergo a substance-abuse evaluation.  She testified that he did not provide
her with a report of a substance-abuse evaluation prior to the State’s filing
of a CHINS petition despite her strong recommendation.

¶ 36.        
Second, the State presented evidence that father, mother and the child
have struggled with housing.  The social worker testified that in her meeting
with father and mother, father acknowledged his challenges with housing.  In
particular, the social worker testified:

And
[father] provided a fair amount of information and explained, you know, this is
why we were homeless this year; this is what happened next.  So he sort of
provided the sequence of events over the past, I don’t know, maybe two years or
so that then resulted in them residing at [mother’s sister’s].  So we talked
about being kicked out of, or losing two housing—two homes, ending out in
shelters, getting kicked out of a COTS shelter most recently, and staying at
his brother’s temporarily, in (indiscernible), and winding up in
(indiscernible), in [mother’s sister’s] home.

 

The
social worker further testified that both father and mother acknowledged that
the lack of housing was a “repetitive pattern.”  Father’s mother likewise
described father’s and mother’s serial housing arrangements.

¶ 37.        
For the most part, that is the foundation upon which the CHINS finding
rests.  The above recitations are not abbreviated summaries of the evidence
presented in support of the State’s CHINS petition; they are the
evidence.  The question is whether, absent more, that evidence is sufficient to
support a finding that the child is “without proper parental care or
subsistence, education, medical or other care necessary for his or her
well-being.”  33 V.S.A. § 5102(3)(B).  

¶ 38.        
I recognize the trial court’s difficult position.  On the one hand, a
court cannot and should not check its common sense, and its experience of the
real world, at the courthouse door.  I have no doubt that parental opiate
addiction and housing instability are two factors very frequently associated
with children who are without proper parental care necessary for their
well-being.  Where parents have no stable place to live, I can well imagine
they may find themselves caring for their children in unsuitable or even
dangerous environments.  Multiple moves can be disruptive to their children’s
community activities, schooling, or relationships.  And an active opiate
addiction can cloud even the most caring and thoughtful parent’s judgment and
capacity to properly care for his or her child.

¶ 39.        
On the other hand, if the State is to take the awesome step of
interposing itself into the parent-child relationship, it cannot rely on broad
generalizations or per se rules; it must have some individualized evidence that
a child is without proper parental care necessary for the child’s well-being. 
In this case, we know that the parents struggled to find stable housing.  But
there is no evidence in the record that, as a result of this struggle, the
child ever resided in unsafe, unsuitable or unhealthy housing.  The evidence
was that the family lived with mother’s sister during the most recent period of
DCF engagement, and that L.M. moved in with her paternal grandparents around
the time of the CHINS petition.  There is no evidence in the record that either
home was unsafe or unsuitable for the child’s well-being.  Nor was there
evidence that the child lived in an unsafe or unsuitable setting prior to DCF’s
most recent engagement.[4] 


¶ 40.        
Moreover, the fact of sleeping under multiple different roofs over a
two-year period does not by itself support a finding that a child is without
proper parental care; parents that move frequently due to their work are not
per se unable to properly care for their children.  And in this case, there is
no evidence of harm or risk of harm to the nearly three-year-old child because
she slept under several different roofs during a two-year period.  If important
activities or relationships, or the child’s sense of security and well-being
were disrupted by the moves, the evidence does not reflect that.

¶ 41.        
Finally, father’s untreated longstanding opiate addiction is undoubtedly
a red flag.  But without more, I cannot tell whether and how it put the child
at risk.  The social worker testified that father claimed to be self-medicating
with Suboxone while waiting to get into treatment, and that he did not provide
her evidence of a substance abuse evaluation during the course of her
involvement with the family.  This is the most concerning constellation of
evidence, and is the reason why this is a very close case.  But it cannot be
that the child of every parent with an admitted opiate addiction is presumed
CHINS without any individualized showing.  See, e.g., B.C. v. Dep’t of Children
& Families, 846 So. 2d 1273, 1275 (Fla. Dist. Ct. App. 2003) (reversing
adjudication of dependency on basis of father’s drug and alcohol abuse where
there was “no testimony that the father failed to meet the child’s needs while
the child was in his care, no testimony that physical harm had come to the
child while in the father’s care, and no testimony that the child had been
emotionally or mentally harmed by his father’s drinking and drug abuse”).  

¶ 42.        
In this case, there is no evidence that father was failing to meet his
own or the child’s day-to-day needs on account of his admitted addiction, and
no evidence that he placed the child in unsafe or unhealthy situations or
failed to properly supervise her.  There is not even any evidence as to what
steps, if any, he did take to undergo an evaluation, or why he did not.  The
only evidence as to father’s current status was that he was self-medicating
with Suboxone—a drug used in treatment for opiate addictions.  There is no
evidence as to whether his self-treatment regimen was enabling him to meet his
responsibilities.  Had the State subpoenaed mother or some other competent
witness, it might well have elicited testimony not only that father had a
generalized problem with opiates, but that he was engaging in conduct that put
the child at risk—whether that be caring for the child while under the
influence, leaving the child with someone, perhaps mother, who was not able to
care for the child, or otherwise failing to meet the child’s needs.

¶ 43.        
I am not suggesting that a child is not CHINS until the child has
actually suffered harm.  Nor am I suggesting that the State needs to provide
expert testimony in every case about the effect of opiate addiction on a
parent’s ability to care for a child.  But I do believe that an individualized
assessment of the risk of harm facing a child is required; blanket
generalizations about opiate addiction and housing instability are not enough
to support a CHINS finding.  Although the State argues that the record here
reflects much more than that, I do not believe the evidence supports this
claim.  

¶ 44.        
The State also points to the parents’ failure to enroll the child in daycare,
as recommended by DCF, as a factor supporting the CHINS finding.  There is no
evidence in this case that the child was not cared for during the day, or that
outside daycare was necessary to protect the child’s well-being.  A DCF
recommendation that the parents enroll the child in daycare does not convert
outside daycare into an essential component of parental care, or the absence of
outside daycare into evidence of CHINS.  Although DCF is free to recommend
strategies to struggling parents, and to consider whether parents comply with its
recommendations as factors guiding DCF’s own decisionmaking, a parent’s failure
to follow DCF’s recommendation is not itself evidence of a child lacking proper
parental care.  A parent’s failure to follow DCF’s recommendation may be
important evidence that a parent has forgone the opportunity to address an underlying
problem or risk of harm, but it is that problem or risk of harm that
supports a CHINS finding, not the failure to follow DCF’s recommendation in and
of itself.  Absent evidence that this child was not cared for during the day,
or that the child had some particular need that could be addressed in outside
daycare, the parents’ failure to enroll their two-year-old child in daycare is
not a factor that supports a CHINS finding.

¶
45.        
The Legislature and this Court, have consistently recognized the
primacy of the parent-child relationship, and the limitations on State
authority to intervene in that relationship.  See 33 V.S.A. § 5101(3)
(statute should be construed to “preserve the family and to separate a child
from his or her parents only when necessary to protect the child from serious
harm or in the interests of public safety”); In re N.H., 135 Vt. at 236
(recognizing that “the freedom of children and parents to relate to one another
in the context of family, free of governmental interference, is a basic liberty
long established in our constitutional law” (citing Stanley v.
Illinois, 405 U.S. 645 (1972); Prince v.
Massachusetts, 321 U.S. 158 (1944); Meyer v. Nebraska, 262 U.S. 390 (1923))).  This may well be a case in which, armed with
complete information, I would agree that the child in question was CHINS.  But
the evidence actually admitted into the record at the hearing below does not
get me there.  Augmenting the record evidence with broad-brush presumptions or assumptions
without individualized evidence of harm or risk of harm to the child in this
case violates the rigorous statutory and constitutional limitations on the
authority of the State in this realm.  For these reasons, I respectfully
dissent.

¶
46.        
I am authorized to state that
Justice Skoglund joins this dissent.

 


  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Associate Justice
 
  

 





[1] 
Mother has another minor child by a different father who was also the subject
of CHINS proceedings.  





[2] 
The issue at the disposition hearing, by contrast, is where to place a child
found to be CHINS, and “the determination of parental unfitness, which triggers
the transfer of custody away from the parents, must be made at the disposition
hearing.”  In re R.L., 148 Vt. at 227, 531 A.2d at 911.





[3] 
In reaching our decision, we do not rely on statutory definitions in 33 V.S.A.
§ 4912, which concern the child protection registry, or on administrative rules
that similarly concern the registry process.  “[W]e have expressly recognized
that the statutes governing the registry process, found in chapter 49 of Title
33, have legislative goals, functions, and procedures completely different from
those governing juvenile proceedings in family court.”  In re M.E., 2010
VT 105, ¶ 13, 189 Vt. 114, 15 A.3d 112 (quotation omitted). 





[4] 
The most that can be inferred from the record is that at some unspecified time
or times in the past the parents and child spent time in a homeless shelter. 
But there is no evidence as to the condition of the shelter, the amount of time
the child spent there, or how long prior to the CHINS petition the family spent
time in a shelter.