2012 VT 103

**In re M.A., Juvenile**

[60 A.3d 732]

No. 12-158

¶ 1. December 17, 2012. Mother appeals from a CHINS adjudication of the superior court, family division, based on a finding that she repeatedly induced the child to make false allegations of abuse against father. Mother contends the judgment is unsupported because there was no evidence or finding that the allegations of abuse were the product of intentional coaching or mental illness. We affirm.

¶ 2. The record evidence may be summarized as follows. M.A. was born in 2005. The parties separated when M.A. was twenty-two months old. A parentage action in 2008 resulted in a stipulated order that provided for shared legal custody, awarded mother sole physical custody, and granted father visitation on alternate weekends and holidays.

¶ 3. In July 2008, mother became concerned about a nightmare that M.A. reported, after a weekend visit with father, in which a man named "Matt" removed M.A.'s clothes. Father had a friend named Matt. Mother reported the dream to M.A.'s pediatrician, who made a report to DCF. DCF found no grounds to investigate.

¶ 4. In late December 2008, mother contacted DCF to report that M.A. told

her that father's new live-in partner had hit him with a spoon, stick, and shovel. DCF again found no basis to investigate. In late March 2009, mother observed what appeared to be a bite mark on M.A.'s bottom and made another report to DCF and his pediatrician, who filed a DCF report. Mother also filed a complaint for relief from abuse against father's partner. DCF substantiated father's partner for abuse, but later reversed the decision. The following month, mother made another report to DCF about suspected abuse by father's friend Matt. DCF again found no basis to investigate.

¶ 5. The parties remained in high conflict during this period of time. Father was angered by the relief-from-abuse complaint against his partner, and filed a motion to modify parental rights and responsibilities. Mother filed a counter-motion. Although the parties withdrew their respective motions in July 2009 after meeting with a mediator, mother became additionally upset about DCF's decision to reverse the finding of abuse by father's partner. In September 2009, she reported renewed concerns about abuse by father's partner to the police, but DCF, when contacted, declined to investigate further.

¶ 6. In November 2009, mother again informed DCF about possible abuse by father's partner. Following an investigation, the complaint was not substantiated. The following month, mother again contacted DCF to report physical abuse by father. The report was not found to warrant investigation. In February 2010, mother informed a DCF investigator that M.A. had said, in reference to father, that "I eat cock." A few days later, mother reported that she had a tape recording of M.A. making additional disclosures of sexual abuse by father. After a full investigation, including interviews with M.A., DCF closed the investigation for lack of substantiation.

¶ 7. In April 2010, M.A. returned from father's house and reportedly told mother that father had choked him. Mother reported the matter to DCF. In June 2010, she observed marks on M.A.'s neck and informed DCF. The same month, mother and M.A. began to attend family therapy. During these sessions, M.A. made statements indicating that father was "bad" and described being grabbed or choked, resulting in additional reports by the therapist to DCF. The therapist noted that M.A. provided little detail about the incidents, and recounted the events in an "almost bored tone."

¶ 8. Conducting a family evaluation during this period, a forensic psychologist called into the matter also noted that M.A.'s descriptions of alleged abuse by father were "vague and sparse," and that M.A. seemed uncharacteristically expressionless when describing them. The psychologist observed that M.A. was generally upbeat and happy, and had comfortable, positive interactions with father.

¶ 9. Mother filed additional reports of abuse with DCF, the police, and the child's pediatrician in November and December 2010. The pediatrician's notes recount a conversation with M.A. in which he describes abuse by father, but the court here found that the child's narrative was akin to "reciting a speech." Mother's report to the police in December recounted a bizarre episode in which father had allegedly "duct taped" M.A. to a chair and "put[] his finger in [M.A.'s] bum."

¶ 10. Following an extensive review of the record, summarized above, DCF filed a CHINS petition in March 2011, stating that mother had filed twenty-seven child abuse reports with DCF since the first report in July 2008, that none had been substantiated, that it appeared mother was intent on disrupting and distorting M.A.'s relationship with father, that her actions were either intentional or the result of mental health issues, and that her conduct had placed the child at risk.

¶ 11. The trial court held a contested hearing over the course of nine days,

concluding in November 2011, and issued a written decision in May 2012. The court framed the central issue as whether M.A. had been abused by father and, if not, to what extent mother was responsible for the false allegations of abuse. After reviewing the evidence, the court found no "reliable evidentiary support for any of the[] various claims of abuse." As to mother's role in the claims, the court relied on the testimony of two expert witnesses, Dr. David Mantell, a clinical psychologist, and Dr. Joseph Hagan, a behavioral pediatrician, in finding that "there was ample evidence of coaching here." Dr. Mantell described coaching as the use of "suggestion, direction, external influence to cause the child to make bad reports about his dad," and observed that it could take a number of forms, from the "absolutely malicious and sinister" to the sort that is "anxiety driven" and largely "unconscious." After reviewing the record of over sixty-six separate reports of abuse to physicians, the police, and DCF, Dr. Mantell was persuaded to a medical certainty that mother had coached M. A. into making the allegations against father, stating that the "record indicates a persistent, strong and defining maternal influence over [M.A.] to report abuse." Not having evaluated mother directly, Dr. Mantell could not say whether the coaching was malicious, anxiety driven, the product of an underlying clinical disorder, or from some other motive.

¶ 12. The court noted that Dr. Hagan had also found no evidence of abuse, and "clear evidence of coaching." Dr. Hagan observed that mother's claims had gradually escalated from allegations against others to accusations against father, "upping the ante" as her relations with father deteriorated and her claims went unsubstantiated. In his opinion, the evidence showed to a certainty that M.A. had "been told to say what he says" by mother, who "cannot see the truth." Dr. Hagan was also of the view that coaching of this nature was "emotionally abusive," and that mother's actions had "caused psychological injury [to M.A.] that's going to be hard to remediate." Dr. Mantell shared the view that it was "child abuse" to subject M.A. to the stress and trauma of multiple needless medical and forensic evaluations.

¶ 13. The trial court thus found that, although the question of whether mother "actively" or consciously coached M.A. was "problematic" based on the evidence, it was clear that she was the cause of the unsupported reports. When M.A. gave neutral explanations for marks or bruises, she "pressed him until he proffered explanations involving father." The court found in summary: "To the extent coaching occurs through a parent's relentless questioning of a child until [he or she] provide[s] answers the parent deems satisfactory, the Court concludes there was ample evidence of coaching here." As to its impact on M.A., the court noted the psychological harm caused by the "repeated, baseless accusations of abuse," the multiple interviews, physical examinations, and "[h]undreds of hours of [M.A.'s] childhood" consumed by these investigations, and concluded that the State had met its burden of proving that M.A. lacked the "care necessary for his or her well-being" under 33 V.S.A. § 5102(3)(B). This appeal followed.

¶ 14. On appeal, mother challenges none of the court's findings summarized above. Instead, she asserts that they were simply insufficient to support its conclusion that M.A. was a child in need of care and supervision because there was no evidence or finding that her coaching of abuse was intentional or the product of mental illness. Mother cites no authority that supports the claim, nor have we found any. On the contrary, we have upheld CHINS adjudications and even more serious claims of parental unfitness in numerous circumstances where a parent's actions — intentional or not — have

placed a child's welfare at risk. See, e.g., *In re B.C.*, 169 Vt. 1, 14, 726 A.2d 45, 54 (1999) (upholding termination of parental rights based in part on parent's addiction to drugs and lack of contact despite parent's claimed need to "isolate herself to address her drug problem"); *In re J.B.*, 167 Vt. 637, 640, 712 A.2d 895, 898 (1998) (mem.) (upholding termination of parental rights where mother's psychological disorders and vulnerability to abusive relationships deprived child of safe, stable environment); see also *In re S.S.*, 501 S.E.2d 618, 620 (Ga. Ct. App. 1998) (noting that evidence sufficient to support a finding of child deprivation must show "either intentional or unintentional misconduct resulting in the abuse or neglect of the child or . . . incapability to care for the child" (quotation omitted)).

¶ 15. Mother's reliance on *Renaud v. Renaud*, 168 Vt. 306, 721 A.2d 463 (1998), is misplaced. *Renaud* was a custody dispute where, following the parties' separation, mother filed a number of unsuccessful relief-from-abuse petitions alleging that father had abused the child. While acknowledging the potential for parental alienation in these circumstances, we affirmed the trial court's custody award to mother based on their "close emotional relationship," the potential detriment to the child from a separation, and mother's efforts in counseling to alleviate her anxiety. *Id.* at 308, 721 A.2d at 465. The principal focus in *Renaud* was whether "mother's purpose was to alienate the child from his father," *id.* at 312, 721 A.2d at 467, and we noted in this regard that society has a strong interest in encouraging the reporting of abuse — even where the reports ultimately prove to be without merit — when there is at least a reasonable basis for the allegations. *Id.* at 311, 721 A.2d at 467. We concluded that the evidence on the whole did not support a finding that mother's purpose was to alienate the child from his father, or that her concerns were wholly unfounded. *Id.* at 312, 721 A.2d at 467.

¶ 16. Significantly, there was no allegation or finding in *Renaud* that, apart from the filing of several unsuccessful complaints, mother had subjected the child to pressure or coaching to elicit allegations of abuse against her former spouse. Moreover, although the mother's complaints were factually weak, and potentially alienating, the trial court "expressly found that [her] actions were transitory, unlikely to be repeated, and subject to cure." *Id.* at 313, 721 A.2d at 468. Here, in contrast, the record and findings present an escalating pattern — over an extended two-and-a-half year period — of scores of increasingly serious allegations of abuse, constant coaching of the child to allege abuse in conformity with mother's preconceived views, and clear evidence of resulting psychological harm to the child. Thus, *Renaud* is not controlling.

¶ 17. As we have repeatedly observed, the "primary concern of the family court . . . is to protect the welfare of the child." *In re B.S.*, 166 Vt. 345, 352, 693 A.2d 716, 721 (1997); accord *In re M.L.*, 2010 VT 5, ¶ 6, 187 Vt. 291, 993 A.2d 400 (family court's primary concern in CHINS proceedings "must be with the welfare of the child" (quotation omitted)); see also 33 V.S.A. § 5101(a)(4) (purpose of juvenile proceedings is "[t]o assure that safety and timely permanency for children are the paramount concerns" in judicial proceedings). Here, a clear preponderance of the evidence supported the trial court's finding that the child's allegations of abuse were the product of mother's coaching, that this had caused psychological harm to the child, and posed a continuing risk of harm. See *In re R.P.*, 949 N.E.2d 395, 401-02 (Ind. Ct. App. 2011) (upholding CHINS adjudication on basis that mother's repeated coaching of children to allege abuse had unnecessarily "subjected [them] to multiple sexual abuse examinations" and endangered their mental health). This was sufficient to support the judgment.

*Affirmed.*